Jack Rosenberg, J.
This matter arises as a hearing to determine whether a warrant should issue to permit the seizure of the motion picture film “ Censorship in Denmark: A New Approach.” The issue is whether there is probable cause to believe that the film is property used or possessed with intent to be used as a means of committing a crime, or property constituting evidence of a crime. (See Code Crim. Pro., § 792.) The crime involved is obscenity as defined in section 235.00 and 235.05 of the Penal Law.
The need for this hearing flows from Lee Art Theatre v. Virginia (392 U. S. 636), where the United States Supreme Court ruled that the protection provided by the First Amendment required that those responsible for the public showing of an allegedly obscene film be heard on the issue of obscenity before the film could be seized by the police pursuant to a warrant of seizure. The court held that the First Amendment requires an adversary hearing before seizure in such a case.
In its opinion in Lee Art Theatre (supra) the Supreme Court referred to and relied on Marcus v. Search Warrant (367 U. S. *312 717, 731-732), where it had rejected a seizure of obscene matter on the authority of a warrant ‘ ‘ issued on the strength of the conclusory allegations of a single police officer The court in Lee Art Theatre went on to assert that it was unnecessary to decide whether the Justice of the Peace should have viewed the motion picture before issuing the warrant.
In the matter here under consideration this court elected to view the motion picture in question itself. Hence this opinion is based, not on any warrant issued in reliance on the conclusory assertions of police officers who viewed it, but on the basis of viewing of the film by the court itself.
It was the position of the District Attorney, who offered the film in evidence as People’s Exhibit I and rested his case without producing further witnesses, that, for purposes of the constitutionally required adversary hearing, the film itself and its contents sufficed to establish probable cause to believe the crime of obscenity has been committed.
The prosecution took this position even though the film is couched in documentary form. It purports to be a report on and examination of the effect and operation of a new law in Denmark which abolishes anti-obscenity laws. There is legal mention of one limitation imposed by Danish law, that, in sex films and sex shows which contain views of sexual intercourse, the male must withdraw and have his orgasm outside the female (presumably to demonstrate the validity of the intercourse and orgasm). The court recalls no mention of further limitations but it hazards the opinion that there may well be a ban on entry of minors into such shows and films.
“ Censorship in Denmark ” opens with views of Copenhagen and a 1 ‘ pornography fair ’ ’ much like our auto and giftwares shows. It seeks to interview briefly both those waiting in long lines to enter the show and those leaving as to their reasons for attending the fair. It then moves into the fair. There are shots of booths and displays in the fair. There are also shots of stores in Copenhagen selling pornography and showing displays of books and wares of pornography. Also shown are interviews with the operators of such stores and of clubs which put on sex shows. In these interviews the operators are questioned as to how they run their businesses. Then the film shows portions of what are known and generally characterized as “stag” films showing a woman masturbating and men and women having intercourse. The accompanying sound track talks in a purportedly documentary fashion of the poor quality of these films and the fact that making and showing such films *313 is illegal in the United States. An actress in one of these films is interviewed at her home with her husband. The film also contains a lengthy section showing the making of a “ stag ’ ’ film showing intercourse between a sailor and a woman with, again, a documentary discussion of how such a film is made and exploited commercially and how the actors in it are recruited. Finally there is shown a sex club show with the audience in the club watching strip teases and lengthy sexual dancing by females in various stages of nudity, climaxed by approximately five minutes of lesbian sex in which three naked women participate. Also interspersed in the film is an interview while she is fully clothed with one of the participants in this scene and another nude strip show as to why she participates in such shows and the effect of such participation on her.
All in all this film incorporates in the matrix of a documentary show major portions of at least three standard type “ stag ” films, any one of which clearly qualifies as hard-core pornography. In one portion the male orgasm is shown occurring on the belly of the female. In another a male’s orgasm is shown occurring on the forehead of a female. In the triple lesbian portion of the film the sound track (dubbed it is alleged) records the sighs, groans and other explosive sounds accompanying a female orgasm.
The foregoing summary of the highlights of the film here under consideration is set forth because in the adversary hearing there was no dispute as to the contents of the film among the witnesses for the distributor and theatre managers involved in the showing of this film in the four New York City art theatres in which it is currently running. Bather the major question raised by their testimony Was as to whether the material contained in the film as described above meets the threefold statutory test for obscenity set forth in decisions of the United States Supreme Court.
That test was first announced in Roth v. United States (354 U. S. 476) and was reaffirmed in a series of later cases. The court stated it thus in Memoirs v. Massachusetts (383 U. S. 413, 418): “ Three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value.”
There were three days devoted to taking testimony of witnesses for the defense. Aside from the vice-president of the *314 corporation distributing “ Censorship in Denmark ” nationally, the witnesses all were presented as experts who devoted themselves to following the injunction of the United States Court of Appeals for the Fourth Circuit in Tyrone, Inc. v. Wilkinson (410 F. 2d 639, 641), that the adversary hearing required before seizure of a movie as obscene ‘ ‘ must be ‘ designed to focus searchingly on the question of obscenity ’. Marcus v. Search Warrants, 367 U. S. 717 * * # (1961).”
The first expert witness was a pediatrician whose qualifications as a claimed expert on ‘ ‘ contemporary community standards relating to the description or representation of sexual matters ” were that he was chairman of a Citizens Committee for the Inclusion of Family Living and Sex Education in the school system of Long Beach and a guest lecturer on family living and sex education at Nassau Community College. He disavowed expertise on the subject of community standards but did testify that the film under consideration in the instant hearing did not appeal predominantly to prurient interest but was rather a cold clinical description of pornography which was therefore not patently offensive in its representation of sexual matters. His response to a question as to whether the film affronted contemporary community standards was that it did not affront him and that he is not an arbiter of such matters.
The second witness was a film critic of a metropolitan daily newspaper. He, too, found the film one not appealing to a prurient interest in sex. He expressed doubt that the film affronts contemporary community standards relating to the description or representation of sexual matters but based his conclusion on the belief that “most of the audiences by now are shockproof who go to these type of movies.” None of his testimony contained any basis for qualifying him as an expert of contemporary community standards.
The third witness was a professor of English at Buffalo State College whose claim to expertise in the issue of film obscenity was that he had worked some years in research at the Indiana University Institute for Sex Research, the institute which gained some public notoriety some years ago on the basis of the publication of the Kinsey report. He also did specific research, on the doctoral level, in Anglo-American traditional exotica, and had appeared to testify on “stag” films before the Chief Counsel of the President’s Commission on Pornography and Obscenity. He was also chairman of a panel on obscenity in folk literature for the American Folk Lore Society.
*315 This 1 ‘ expert ’ ’, not surprisingly, saw ‘1 Censorship in Denmark ” as primarily a sociological document. He claimed to have as much knowledge of the community standards with regard to the depiction or representation of sexual matters “ as anyone ” but he gave no testimony to demonstrate how he had obtained such knowledge, other than his observations in front of his English classroom, contacts with his students and occasionally with their parents, with his colleagues and friends with “ interests in these directions.” The court cannot but wonder how this witness can equate these groups with the general community in Buffalo, let alone the entire country, the standard established by the Supreme Court in Jacobellis v. Ohio (378 U. S. 184). In that case Mr. Justice BuEsriTAisr, announcing the judgment of the court, rejected the view that in applying the contemporary community standard test, local guidelines might be appropriate, saying (p. 195): “ the constitutional status of an allegedly obscene work must be determined on the basis of a national standard. It is, after all, a national Constitution we are expounding. ’ ’
The three additional expert witnesses who testified in the September 10 hearing were somewhat more impressive than those who testified in the August hearings. They, too, left serious doubts as to their qualifications as experts on community standards. Generally they left the court with the impression that they were far in advance of the general community in their ability to accept graphic descriptions or representations of sexual matters without affront. All stressed the desirability of open discussion of sexual matters and the need for education of men and women for full appreciation of the importance of sex as a source of enjoyment and human understanding. All tended to accept as a desirable standard not the threefold test laid down by the Supreme Court but rather the view that so long as films showing sexual activity were restricted to adults who viewed them voluntarily, having been apprised of the nature of the films by appropriate labels, they should not be suppressed. They tended to view sex films as being essentially educational rather than appealing to prurient interest. At the •same time most of the defendants’ expert witnesses agreed that parts of 6 ‘ Censorship in Denmark ’ ’ were far more explicit in their presentation of sexual behavior and practices than any films they had seen. And they made much of the fact that this material was presented in the manner of a documentary, ignoring the possibility that struck the court, as it viewed it, that much of the .sound track commentary had a tongue-in- *316 cheek sound. How better could one achieve the legal presentation of the ‘ ‘ stag ’ ’ film material incorporated in the movie than by .surrounding it with a documentary background which questioned “objectively” the basis of the appeal of pornography and decried the poor film quality of such patent appeals to the basest aspects of the sexual relationship including homosexuality and group sex activity?
In the adversary hearing here under consideration there was only one witness who was also a defendant, the vice-president of the company distributing “ Censorship in Denmark ”, Saul Shiffrin. His testimony demonstrated that the film was being viewed by a large number of people in seven cities throughout the country and was proving profitable. But he also emphasized that its audience was limited by the theatres showing it to adults and that all those who sought to enter and see it were apprised of the nature of its subject matter in the film’s ads and by signs at the theatre box offices. He, too, donned the toga of an expert, as one familiar with audiences and most movies containing graphic presentations of sexual activity, and testified that in his view the film did not appeal primarily to a prurient interest in sex, was not patently offensive and did not affront contemporary community standards relating to the description or representation of sexual matters and was not utterly without redeeming social value. But his testimony, in view of his direct interest in the outcome of the matter, is to be taken with at least a grain of salt.
We are left, therefore, with a record of expert testimony which is of doubtful help. There is serious question as to the qualifications of the witnesses as experts 1 ‘ in the question of obscenity.” (Tyrone, Inc. v. Wilkinson, supra.)
At the outset, it must be noted that this is a preliminary hearing to determine whether a warrant of seizure should issue, not a trial to determine the ultimate question whether the fil-m is obscene. (Smith v. California, 361 U. S. 147, 165; Bethview Amusement Corp. v. Cahn, 416 F. 2d 410, 411.) The test is not a finding beyond a reasonable doubt, but whether there is probable cause to believe a crime has been committed. (Code Crim. Pro., §§ 793, 796; U. S. Const., 4th amdt.) We are here dealing with a First Amendment right, the right to .show a film. (Interstate Circuit v. Dallas, 390 U. S. 676; Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495.) It is this which makes necessary an adversary hearing preliminary to the issuance of any warrant of seizure of a film. (Lee Art Theatre v. Virginia, 392 U. S. 636; Entertainment Ventures v. Brewer, 306 F. Supp. *317 802; Metzger v. Pearcy, 393 F. 2d 202; Tyrone, Inc. v. Wilkinson, supra; Cambist Films v. Duggan, 420 F. 2d 687.)
The testimony of defendants ’ experts contains repeated assertions that the contents of ‘ ‘ Censorship in Denmark ’ ’ are far more explicit in terms of portrayal of genitalic male and female and actual intercourse and other forms of sexual activity than any of the films produced for public distribution they had yet seen or knew of. They acknowledged readily that there were .substantial portions of the film which were pornography, stag films. (Jacobellis v. Ohio, 378 U. S. 184, 197, supra; Ginzburg v. United States, 383 U. S. 463, 499, n. 3.) “ Such materials include photographs, both still and motion picture, with no pretense of artistic value, graphically depicting acts of sexual intercourse, including various acts of sodomy and sadism, and sometimes involving several participants in scenes of orgy-like character.” This description (except for sadism) fits precisely substantial portions of the film here under consideration. No effort was made to claim artistic value. The sole claim was documentary or educational value based on the use of the documentary form.
The fact is that the primary effort of defendants here is to suggest the propriety of this court’s applying another standard even more liberal than that of Roth (354 U. S. 476, supra). That is substantially the standard, now in operation in Denmark, allowing the presentation of films depicting sexual activity, without limit as to how graphic and explicit they are, so long as admission is limited to adults who attend voluntarily and who are apprised in advance of the general nature of the films they will see. This was the standard applied by the defendant Shiffrin to the theatres in which the film was shown. It was the one espoused by several of the expert witnesses presented by defendants. The United States Supreme Court’s decision in Stanley v. Georgia (394 U. S. 557), which ruled that mere private possession of the obscene films could not be punishable as a crime, was a step in that direction. The court struck down a conviction for mere private possession of such a film as a drastic invasion of the personal liberties guaranteed-by the -First Amendment.
But this court, which is one of first resort, cannot undertake to create new doctrines of constitutional law. It must apply established precedents. It is not unaware of the fact that the prudish standards of the ‘1 Victorian nineties” and even of the less restrained though staid puritanical 11 roaring twenties ”, have long gone into discard. It has viewed this film *318 and believes that there is probable cause to believe it has surpassed the limits of the early seventies, limits established by the United States Supreme 'Court in the 1950’s, and clarified and reasserted in the 1960’s. It believes that the very liberal test of Memoirs (383 U. S. 413, supra) has been met. This court finds for purposes of the issuance of a warrant of seizure that ‘ ‘ Censorship in Denmark ”, taken as a whole, has, as its dominant theme, appeals to a prurient interest in sex; it is patently offensive to most Americans because it affronts contemporary community standards relating to the description or representation of sexual matters, and even the effort to present it as a documentary study of pornography fails to give it any redeeming social value.
The court is not unaware of the fact that its holding could serve to put the defendants out of business with respect to the further showing of the film in New York City. It is also aware of the fact that its holding leaves open the possibility of obtaining a ruling after trial on whether this film, which all the defense witnesses concede hovers in the immediate vicinity of the outermost limits of permissible films, is in fact obscene. It, therefore, asks the prosecution to proceed to trial of defendants with the greatest possible speed so as not to subject defendants to loss of income through having their seized film become dated and uncommercial through mere delay. Defendants are entitled to a speedy trial on the merits and to the opportunity to obtain speedy appellate review, if found guilty.
One final point. Defendants contend that the fact that the State of New York has not seen fit to establish a statutory procedure makes the procedure used by this court invalid. They point out that a procedure was established for enjoining distribution of obscene books, magazines, pamphlets or other written matter but none for obscene films. They argue that such a statutory procedure is needed to empower this court to act here.
But clearly this failure of the Legislature was not intended to make article 235 of the Penal Law inapplicable to films as contrasted with other obscene material. And in Entertainment Ventures v. Brewer (306 F. Supp. 802, supra) a three-Judge constitutional court dealt with a similar problem, indicating that a preliminary adversary hearing was needed, even though it noted that the State of Alabama had no statute providing for speedy determination of the obscenity of a film which had been denied circulation by State authorities, at page 811. Defendants cannot use the absence of such a procedural statute to bar the State from enforcing its criminal laws.
*319 The authority of this court to hold the hearing here under consideration flows from section 30 of the New York City Criminal Court Act, which declare Judges of this court are Magistrates and shall have and exercise all the powers which are conferred by law upon Magistrates and Police Justices under the provisions of the Code of Criminal Procedure. That code, in section 146, defines a Magistrate as an officer having power to issue a warrant of arrest of a person charged with an offense. Section 796 provides that if the Magistrate be satisfied that there is probable cause to believe that a crime has been committed, he must issue a search warrant. It is these statutory provisions that are the source of this court’s authority to conduct the adversary hearing which the Constitution requires and on the basis of which it is now issuing a warrant authorizing the seizure of the film “ Censorship in Denmark ”, as well as a-complaint.
Warrant to issue.
Complaint to be issued.