**G. I. DISTRIBUTORS, INC., et al.,**
**Plaintiffs-Appellees,**

v.

**Patrick MURPHY, individually and in his capacity as Police Commissioner of New York City, Defendant,**

**Frank S. Hogan, individually and in his capacity as District Attorney of New York County, Defendant-Appellant.**

**No. 3, Docket 72–1208.**

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1972.

Decided Nov. 14, 1972.

Hugh Anthony Levine, Asst. Dist. Atty., New York County (Frank S. Hogan, Dist. Atty., and Michael R. Juviler, Asst. Dist. Atty., on the brief), for defendant-appellant.

Herald Price Fahringer, Jr., Buffalo, N. Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., on the brief), for plaintiffs-appellees.

Before FRIENDLY, Chief Judge, and LUMBARD and FEINBERG, Circuit Judges.

LUMBARD, Circuit Judge:

The District Attorney of New York County [1] appeals from part of an order of the Southern District of New York, 336 F.Supp. 1036, which requires him to return to the appellees 19,000 magazines which had been seized less than 18 hours prior to an adversary hearing on their obscenity. At the hearing which was held the following morning Judge Moldow of the New York City Criminal Court authorized the seizure. Judge Weinfeld found that the procedures followed by the police in confiscating these magazines prior to the hearing violated the first amendment as applied to the state by the fourteenth amendment. We reverse for the reasons given below.

On Thursday, January 6, 1972 the New York City police, acting pursuant to a search warrant and under the supervision of the District Attorney of New York County, entered the Long Island City warehouse of appellee G.I. Distributors, a wholesale distributor of books and periodicals, and seized six copies each of 55 allegedly obscene magazines.[2] While conducting the

---

1. Defendant Patrick Murphy, sued individually and in his capacity as Police Commissioner of New York City, does not appeal from the lower court order.

2. On January 5, 1972, the New York City Police Department obtained a search warrant from Judge Tyler of the New York Criminal Court authorizing the seizure of copies of 24 specified magazines and all the books and records of G.I. Distributors. The warrant for some reason contains no finding that the magazines are obscene; but the police affidavit on which the warrant was based does contain such a claim. While executing the warrant the next day the police found 32 other publications which they felt were obscene. Judge McQuillan, another Criminal Court judge, came to G.I.'s premises on the evening of January 6th to view these magazines. He found them to be obscene and issued a search warrant authorizing the seizure of six copies of each.

search the police discovered 19,000 additional copies of the publications they were seeking. An adversary hearing on the magazines' obscenity was scheduled for the following morning and G.I. and its attorney were notified. To prevent possible removal of the magazines before the hearing, the police packed the periodicals in 221 cartons and stationed a police officer on G.I.'s premises overnight.[3]

The hearing was held the next morning before Judge Moldow, who examined samples of the 55 magazines and found probable cause to believe that they were obscene. He issued a search warrant authorizing the seizure of the 19,000 copies [4] and they were removed from G. I.'s Long Island City warehouse the same day.[5]

Three days later, on January 10, 1972, appellees brought suit under 42 U.S.C. § 1983 in the Southern District seeking return of the 19,000 magazines and other relief.[6] Relying on the Supreme Court's decision in A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), and our decisions in Astro Cinema Corp. v. Mackell, 422 F.2d 293 (2d Cir.1970) and Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir.1969), Judge Weinfeld held that the first amendment, as applied to the states by the fourteenth amendment, requires an adversary hearing before the seizure of allegedly obscene material. He found

One of the 56 periodicals which the police were authorized to seize could not be found.

On this appeal we do not reach the question of whether the search warrants were valid under the fourth amendment. Nor is there any occasion for us to pass upon whether the magazines were in fact obscene—a question which was not raised either here or in the district court. The appellees' brief states that at the hearing before Judge Moldow counsel for appellees argued that the magazines were not obscene.

3. When they left, however, the police also took all of the books and records of G.I. Distributors including those that dealt with publications not at issue in the current case. The following day, January 7, 1972, the police returned with a warrant to search the premises of appellee Data Affiliates, Inc., a New York corporation in the business of supplying computer services to several companies. Data Affiliates leases office space from G.I. Distributors and provides some computer services to it but these are its only connection with G.I. The police seized all of their business records and computer tapes.

4. The New York Criminal Procedure Law authorizes a Criminal Court judge to issue a search warrant and, when necessary, to conduct a hearing to "examine, under oath, any person [who] . . . may possess pertinent information." See Criminal Procedure Law §§ 690.05(1), 690.40(1), McKinney's Consol.Laws, c. 11–A. Nevertheless, appellees assert that several recent New York decisions have

held that the Criminal Court has no jurisdiction to conduct an adversary hearing on the question of obscenity prior to issuing a search warrant, because New York already has a civil procedure for suppressing obscene material, see C.P. L.R. § 6330, and because there may be constitutional objections to the search warrant procedure. The New York Supreme Court decisions are in conflict on this matter, *compare* People v. O'Brien, 66 Misc.2d 254, 320 N.Y.S.2d 425 (Sup. Ct.1971); Milonas v. Schwalb, 65 Misc. 2d 1042, 319 N.Y.S.2d 327 (Sup.Ct.1917) *with* Bethview Amusement Corp. v. Judges of Nassau Co., D.Ct., 66 Misc.2d 717, 322 N.Y.S.2d 42 (Sup.Ct.1971) *(and)* People v. Shiffrin, 64 Misc.2d 311, 314 N.Y.S.2d 745 (Sup.Ct.1970), and, absent any definitive word from the state appellate courts, we feel constrained to follow the clear grant of jurisdiction which is contained in the Criminal Procedure Law. Moreover, if appellees, plaintiffs below, wished to challenge the jurisdiction of the Criminal Court in this matter under New York law, they should have raised that issue in the New York courts, not here.

5. The facts in this paragraph are asserted in the appellant's brief and were stated at argument. They were in part conceded in the argument of appellees' counsel and in part not denied. The record contains no information regarding the hearing before Judge Moldow.

6. They also sought return of all the business books and records that had been taken from the two corporate appellees.

that the overnight quarantine of 19,000 magazines was an invalid prior restraint; he ordered the magazines returned to appellees and granted the other relief prayed for in the complaint.[7]

An application for a stay of Judge Weinfeld's order was denied by this court on January 26, 1972, and by Mr. Justice Blackmun on January 28, 1972.

■ Appellant challenges on this appeal only that part of Judge Weinfeld's order requiring him to return the 19,000 magazines. The District Attorney claims that the procedures followed by the police in sequestering the 19,000 periodicals overnight did not violate the first amendment.[8] We agree.

The discovery of a large cache of magazines thought by the police to be obscene necessitated immediate action on their part to seize it as contraband[9] and to secure it as evidence in a criminal prosecution for wholesale distribution of pornography, a felony under New York law.[10] The police had good reason to be-

---

7. Noting that the other property which had been seized was part of a single successful attempt to shut down all of G.I.'s operations without a prior hearing on whether G.I. was purveying obscenity when less than 10% of publications distributed by G.I. were involved in the pending prosecution, Judge Weinfeld decreed that all of the property taken from appellees except the 330 magazines which had been seized initially be returned on the condition that appellees not dispose "of any of the business books, records and other material directed to be returned, so that they will be available for subpoena in the State prosecution."

A further question is whether the magazines returned to the appellee pursuant to the district court's order have now been distributed to retailers, thus rendering the appeal moot. We were assured on oral argument, however, that a substantial number of the magazines in question are still in appellee's possession and thus there is a live issue whether appellant can retake them pursuant to the state judge's order.

8. The appellant claims for the first time on this appeal that plaintiffs' complaint in the district court also failed to state a claim for federal injunctive relief because there was no showing that irreparable injury resulted from the overnight quarantine of the magazines. See Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); Capital City Gas Co. v. Phillips Petroleum Co., 373 F.2d 128 (2d Cir. 1967). Although we need not consider this issue, we note that appellant has misconstrued the nature of the irreparable injury requirement in first amendment cases. Assuming for the moment that appellees were correct in their assertion that the overnight quarantine before an adversary hearing could be conducted was violative of the first amendment, then

"the procedure leading to the seizure order was constitutionally deficient." A Quantity of Books v. Kansas, 378 U.S. 205, 210–211, 84 S.Ct. 1723, 1726, 12 L.Ed.2d 809 (1964); Bethview Amusement Corp. v. Cahn, 416 F.2d 410, 412 (2d Cir. 1969). "A violation of the Fourteenth Amendment infected the proceedings" and not only the original overnight quarantine of the magazines but their subsequent retention by the police was invalid. See Marcus v. Search Warrants, 367 U.S. 717, 738, 81 S.Ct. 1708, 1719, 6 L.Ed.2d 1127 (1961). Thus, in determining the seriousness of the threatened injury we look not only to the overnight seizure but also to the entire time in which the material would be kept in police hands and away from the public. It makes no difference that the magazines were later found to be obscene in an adversary hearing. See A Quantity of Books v. Kansas, supra, 378 U.S. at 212–213, 84 S.Ct. 1723. If they were seized initially in violation of the procedures mandated by the first amendment, irreparable injury was threatened, and it is now settled law that federal injunctive relief will issue to insure their return. E. g., Astro Cinema Corp. v. Mackell, 422 F.2d 293 (2d Cir. 1970); Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir. 1969); Potwora v. Dillon, 386 F.2d 74 (2 Cir. 1967). See also G.I. Distributors, Inc. v. Murphy, D.C., 336 F.Supp. 1036, 1038–1039 (1971).

9. The New York Criminal Procedure Law authorizes the issuance of a search warrant to seize contraband (i. e., property unlawfully possessed). See New York Criminal Procedure Law § 690.10(2).

10. New York Penal Law § 235.06 (McKinney's Supp.1972), McKinney's Consol. Laws c. 40. On the evening of January 6, 1972 Alvin Druss and Irving Herman, president and secretary-treasurer respectively of G.I. Distributors, had been ar-

lieve that the magazines were obscene, since all of the periodicals specified in the warrant had previously been scrutinized by a judicial officer who had found them to be so. They immediately recognized that an adversary hearing was required before the magazines could be removed and kept until the trial of the criminal charges.[11] The District Attorney scheduled a hearing at the earliest possible time—the following morning—and notified the parties. Understandably anxious that the magazines not disappear during the short delay before the hearing, the police took the precaution to segregate them from the other publications in G.I.'s warehouse and stationed a man there for the night to see that they were not removed. This was a minimal interference with the normal distribution of the magazines because the quarantine occurred only from sometime after 6 P.M., January 6,[12] until Judge Moldow's issuance of the search warrant after a hearing the next morning. As there is nothing in the record to show that G.I. had any plans to distribute any of the magazines after usual business hours on January 6, the interference with possible distribution to retailers could not have amounted to more than a few hours on the morning of January 7th.

◼ The police procedure used here was designed to restrain distribution of the magazines for the minimum time possible until an adversary hearing could be held before a judicial officer. That hearing was held promptly the next morning, and a decision was rendered immediately thereafter. Thus, the procedure did not present the interference condemned in Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) and A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964). *Marcus* involved an attempt to suppress allegedly obscene books by means of a vague search warrant which in effect allowed the police to seize anything that they deemed to be obscene. *A Quantity of Books* concerned the seizure of a large number of books under a statute which did not permit a hearing on the books' obscenity until at least 10 days after the seizure and did not require the judge to make a speedy decision after the hearing. Unlike these cases, no extended interruption in the public's access to the magazines nor long term suppression of possibly nonobscene literature was threatened here. Therefore, we hold that the procedures used by the police in this case did not offend the first amendment.

◼ We find support for our conclusion in several recent Supreme Court decisions. While it has been clear for some time that all prior restraints were not invalid, see Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), it was not until 1965 that the Supreme Court in striking down Maryland's motion picture censorship statute indicated some of the essential elements of an acceptable licensing scheme. Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). The Court stated that any restraint imposed in advance of an adversary hearing on the obscenity question must be "for the shortest fixed period compatible with sound judicial resolution . . . [and] the procedure must

---

rested for felonious wholesale promotion of obscenity.

11. In United States v. Wild, 422 F.2d 34 (2d Cir. 1969) we held that a small number of copies of allegedly obscene magazines could be seized by the police on the strength of a search warrant issued *ex parte* and without a prior adversary hearing, because the danger of suppressing protected expression was minimal. However, in A Quantity of Books

v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964) the Supreme Court held that when a large number of books are to be seized and kept for a substantial time by the police, a prior adversary hearing must be held.

12. Although the record is silent as to when the police first sequestered the magazines, presumably it was sometime after Judge McQuillan signed the search warrant at 6 P.M. on January 6, 1972.

also assure a prompt final judicial decision." Freedman v. Maryland, *supra* at 59, 85 S.Ct. at 739. *See* also Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968); Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971).

Last term the Supreme Court spelled out for the first time a set of specific requirements which would meet, in at least one factual context, the standards laid down in *Freedman*. In United States v. Thirty-Seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), the Supreme Court upheld 19 U. S.C. § 1305(a) which prohibits the importation of obscene materials into the United States and authorizes the seizure of such materials by customs officials pending a hearing by the district court on their obscenity. As enacted by Congress, § 1305(a) contained no time limits within which judicial action had to be commenced. To bring the statute into harmony with the first amendment, the Supreme Court read into § 1305(a) the requirement that judicial "proceedings be commenced within 14 days and completed within 60 days of their commencement." United States v. Thirty-Seven Photographs, *supra* at 373, 91 S. Ct. at 1407.

Justice White, writing for the majority, stated that, "of course, we do not now decide that these are the only constitutionally permissible time limits. We note, furthermore, that constitutionally permissible limits may vary in different contexts". United States v. Thirty-Seven Photographs, *supra* at 374, 91 S.Ct. at 1407. Each pre-hearing seizure must be evaluated in light of its particular circumstances and the nature and duration of the restraint imposed. The procedures followed in this case resulted in the least prior restraint possible in the situation.[13]

Nothing in our decisions in Astro Cinema Corp. v. Mackell, 422 F.2d 293 (2d Cir.1970) or Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2d Cir.1969) is inconsistent with the result we reach here. Both *Astro* and *Bethview* concerned the seizure of a motion picture film during a regular theatre performance as evidence in a later prosecution for the crime of obscenity. The films were not seized by the police as a temporary measure until a full adversary hearing could be had; instead they were to be retained as evidence until the trial of the underlying criminal charges. Thus, the defendants had no way of securing a prompt judicial determination of the question of obscenity except by bringing suit themselves. In such circumstances we concluded that "if the State wishes to interfere *substantially* with distribution of films or books, it must first provide . . . an adversary hearing". Astro Cinema, *supra*, 422 F.2d at 296 (emphasis added). However, when we were presented with a minor and insubstantial prior restraint involving the seizure of a few samples of allegedly obscene materials for evidentiary purposes, we did not hesitate to permit the seizure without a prior hearing. See United States v. Wild, 422 F.2d 34 (2d Cir. 1969), reh. denied (2d Cir. 1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971).

Were we to hold that no prior restraint whatever is permissible, even the few hours in this case, the police would find it virtually impossible to cope with the increasing flow of obscene magazines to the hundreds of outlets in our metropolitan centers. Arrests and the filing of criminal charges will not stop that flow; they provide only a brief interruption after which business continues as usual. The District Attorney

---

13. Appellees contend that *Thirty-Seven Photographs* is inapplicable to the present case because it dealt with the regulation of products coming into this country. In fact, the government's brief in *Thirty-Seven Photographs* argued that the gov-ernment had complete discretion in excluding items coming into the country. The Supreme Court implicitly rejected this contention by choosing to treat the case as one to be tested by settled first amendment precedents alone.

argues that in order to keep illegal publications out of circulation it is necessary to seize and confiscate them. The police seek to utilize New York's search warrant procedure to halt the flow of printed obscenity on the grounds that such materials are both contraband (i.e., unlawfully possessed) and the means for committing the crime of wholesale promotion of obscenity in violation of Section 235.06 of the New York Penal Law. Unless the police are permitted to station an officer where contraband is found for such time as may be necessary to hold an adversary hearing regarding the propriety of the issuance of a search warrant, any seizure of such contraband will in all likelihood be frustrated. With no police observer on the scene, the distributors would be free to remove the material and distribute it from another location unknown to the police; thus, there would be nothing left to seize after the warrant has issued. We think that such considerations far outweigh the very slight interference with possible distribution which was here visited upon the appellees.

Our decision in this case is a limited one. Because of the incomplete record on appeal, we have no basis on which to question the adequacy of the hearing. We decide only that the brief and insubstantial prior restraint which occurred here, followed a few hours later by a hearing, notice of which has been given to those in possession of the alleged obscene publications, does not violate the first amendment.

FEINBERG, Circuit Judge (dissenting):

I dissent.

This seems to me an important and exceedingly close case. Important because it is apparently the first time this court has interpreted recent Supreme Court decisions as allowing seizure of all

copies of an allegedly obscene book or magazine before an adversary hearing to determine obscenity. In Overstock Book Co. v. Barry, 436 F.2d 1289, 1296 (1970), we ruled precisely to the contrary. The case is close because there are persuasive practical arguments for deciding either way and the teaching of the precedents is not clear. But on balance I would affirm Judge Weinfeld's order.

As a matter of common sense, there is a good deal of merit in the majority's position that the prior restraint here was so "brief and insubstantial" that it did not "violate the first amendment." Yet, practicality alone also commends the holding of the district court that in this case there must be "an adversary hearing to determine obscenity prior to restraint or seizure, not a post-seizure hearing." This furnishes a clear, easily applied test of constitutional validity whereas the majority's position will necessarily involve the courts in intractable problems of drawing lines in cases involving attempts to suppress books and magazines.

Similarly, the prior cases leave one in doubt as to the required course here. The majority relies heavily on the standards for administrative film licensing first enunciated in Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649 (1965), and later applied primarily in film censorship cases. E.g., Teitel Film Corp. v. Cusack, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968) (per curiam).[1] These criteria allowed a brief restraint prior to a final judicial determination, but this was explained by the Court as stemming from the unique nature of movie exhibitions—involving advanced scheduling of film runs at specific theatres—and the application of the Freedman rules was explicitly limited to films. 380 U.S. at 60–61, 85 S.Ct. 734, 13 L.Ed.2d 649. See also Times Film

---

1. The Court in Freedman held that to survive judicial scrutiny, any system of film licensing must provide for a prompt decision and speedy judicial review in case the license is denied, must require the li-

censing agency itself to seek the review and must place the burden of proof of obscenity on the censor. 380 U.S. at 58–59, 85 S.Ct. 734, 13 L.Ed.2d 649.

Corp. v. Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961). Recently, however, the Court has applied the *Freedman* standards in two obscenity cases not involving films, Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1970); United States v. Thirty-Seven Photographs, 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971), and the majority cites these decisions to support its rejection of the pre-seizure hearing requirement. On the other hand, the Supreme Court held in A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964)—a decision never explicitly overruled—that the failure of the state to provide an adversary judicial hearing on the issue of obscenity prior to the seizure by police of all copies of a number of books in the hands of a distributor rendered the procedure "constitutionally deficient." *Id.* at 211, 91 S.Ct. 1400. In that case, the statute authorized such seizures with a subsequent hearing to determine whether the seized material was obscene and could be destroyed. The seizures were made pursuant to a very specific warrant issued after a judge had inspected copies of some of the publications proposed to be confiscated, see Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), and the hearing was held ten days later. Nevertheless, the Court invalidated the procedure because "the warrant . . . authorized the sheriff to seize all copies of the specified titles, and . . . P-K was not afforded a hearing on the question of . . . obscenity . . . before the warrant issued . . . ." 378 U.S. at 210, 84 S.Ct. at 1725.

The silent premise of the majority opinion is that Blount v. Rizzi, *supra,* and United States v. Thirty-Seven Photographs, *supra,* make *A Quantity of Books* no longer applicable. I do not believe that these two decisions—which involved federal statutory schemes for administrative review of allegedly obscene materials sold or advertised through the mails [2] or passing through United States Customs [*] respectively—were intended to overrule *A Quantity of Books.* In neither case is there any intimation that *Freedman* is being extended to contexts other than the type of administrative review statutes in question.[3] Indeed, not one of the several opinions in either case even mentions *A Quantity of Books* or the problem of police seizures involved there— and here. This conclusion as to the limited scope of these recent decisions is further reinforced by the fact that the author of the Court's opinion in *A Quantity of Books* wrote the majority opinion in *Blount,* concurred in *Thirty-Seven Photographs,* and yet reiterated, less than three months before the latter decision, the continuing validity of the rule of *A Quantity of Books.* See Dyson v. Stein, 401 U.S. 200, 204, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971) (Brennan, J., concurring).

Therefore, we are left with uncertain guidance in applying precedents to a new fact pattern, not an unusual situation for a court to be in. I will not pretend to be outraged by the restraint in this case of only "a few hours," after which the magazines were found to be obscene. But I do think that the procedure approved here poses dangers to the preferred interests protected by the first amendment. The majority allows the

---

2. The provisions in question, now 39 U.S.C. §§ 3006–07, authorize the Post Office to return all mail and payments addressed to an individual who is found to be selling obscene material or sending advertising for it through the mails.

3. The plurality opinion in *Thirty-Seven Photographs* rested heavily on the unique and historic power of United States Customs officers:

> Customs officers characteristically inspect luggage and their power to do so is not questioned in this case; it is an old practice and is intimately associated with excluding illegal articles from the country.

402 U.S. at 376, 91 S.Ct. at 1408. See also id. at 378, 91 S.Ct. 1400, 28 L.Ed. 2d 822 (Stewart, J., concurring).

seizure prior to an adversary judicial hearing of *all* copies of an allegedly obscene magazine, completely preventing its distribution to the public. This is far different from the seizure of just a few copies for use as evidence, a procedure we have already approved. Overstock Book Co. v. Barry, *supra*. While the restraint prior to the hearing was brief here, it is likely, especially in the absence of specific statutory limitations, that a case-by-case approach will either tolerate the gradual relaxation of constitutional requirements or force this court to make repeated, arbitrary distinctions. How soon must the adversary hearing be held? The prior restraint here was only "a few hours on the morning of January 7th," according to the majority. Would prior restraint of a book or magazine for an entire day be too much? Or a few days? Or a few weeks? How soon must the adversary hearing be concluded? Is there any significant difference between magazines in a warehouse and a supply of books in a retailer's storage area? Although it is asserted that such a flexible approach is necessary to successful enforcement of anti-obscenity laws, we should remember that our primary concern is not with the danger that some obscene publications might escape the prosecutor's net; it is, rather, with the protection of the public's right to read *nonobscene* books or magazines that some official may mistakenly regard as obscene. The furnishing of an effective "safeguard against the suppression of nonobscene books" is what the constitutional issue is all about. See A Quantity of Books v. Kansas, *supra*, 378 U.S. at 208, 84 S.Ct. 1723, 12 L.Ed.2d 809. Drawing the hard-and-fast line of a prior adversary hearing before total seizure of books and magazines—as was done in *A Quantity of Books, supra*—has the virtue of accomplishing just that.[4]

*Blount* and *Thirty-Seven Photographs* may perhaps presage a dilution of the limitations previously imposed on police seizures of allegedly obscene books and magazines. But the Supreme Court has not extended *Freedman* that far, and I would rely on *A Quantity of Books* and on our own prior decision in *Overstock Book Co., supra*, 436 F.2d at 1296. See also American News Co. v. Ladas, 454 F.2d 1237 (6th Cir.1972).

For these reasons, I would affirm Judge Weinfeld's order.

---

4. It is true that the Supreme Court in United States v. Thirty-Seven Photographs, *supra*, engaged in a form of line-drawing when it read into the law a set of time limits for the start and conclusion of hearings following the impounding of allegedly obscene material by United States Customs. 402 U.S. at 373–374, 91 S.Ct. 1400, 28 L.Ed.2d 822. However, this was done to save an existing federal statute incorporating a long-recognized power of national sovereignty. It does not follow that this court should, in the absence of a carefully drawn state statute, invite future litigation on a case-by-case basis to explore further the possible extent of police power to seize and hold material that may ultimately be found to be protected expression.