UNITED STATES of America,
Petitioner,

v.

William BERGER, d/b/a Folly Theatre,
Respondents.

No. 18837–D.

United States District Court,
W. D. Missouri, W. D.

Dec. 29, 1970.

Anthony P. Nugent, Asst. Dist. Atty., for plaintiff.

Louis A. Silks, Shawnee Mission, Kan., for defendant.

## FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND ORDER OF SEIZURE

DUNCAN, Senior District Judge.

On October 30, 1970, the United States District Attorney filed a "Petition For Order To Show Cause" why a search warrant should not be executed against certain motion picture films referred to and described in an affidavit of Paul Anthony White, Assistant United States District Attorney. The petition states that the said films have been found to contain numerous and repeated depictions of nude men and women performing various sexual acts including copulation, fellatio and cunnilingus, both homosexual and heterosexual, that the films have been taken from express companies or common carriers by persons who were believed to have knowledge of their obscene character, and that the films are obscene, lewd, lascivious and filthy within the meaning of Title 18, Section 1462, United States Code.

The affidavit of Paul Anthony White, Assistant United States District Attorney, acknowledged in the presence of the Judge of this court, states that on or about the 27th day of October, 1970, the affiant paid the sum of $4.00 as the price of admission to the Folly Theatre, 300 West 12th Street, Kansas City, Missouri, and while inside he observed the showing of one full length production and five shorter film strips known in

the motion picture industry as "trailers". The affidavit of Mr. White further states:

"On or about Tuesday, October 27, 1970, I did attend the Follies Theatre, 300 West 12th Street, Kansas City, Missouri.

I paid the admission price of $4.00 and was permitted to enter the theatre. I observed the full color production "Anomalies" produced by Collage Films. The first scene is a male figure fully clothed in coat and tie sitting behind a desk who states generally that the movie the audience is about to see depicts various sexual abnormalities. The first scene is entitled "Onanism". It depicts a nude male subject with the male genitals clearly exposed, the male subject lying on the bed with what appears to be a "Girly" magazine. The movie gives the viewer the idea that the nude male subject who is beginning to undertake masturbation is experiencing a sexual fantasy.

Depicted on the screen is a nude female in bed with the nude male subject. The female begins to fondle, lick, kiss, and stroke the male penis. The male sex organ is clearly shown, and the activity hereinabove described by the female subject is clearly depicted. The above activity was depicted on the screen for a period of one minute.

The next scene was captioned "Sadism". The scene again in full color depicts a completely nude male and female in bed together. The male subject begins to rub the vagina of the female subject, the female vagina is clearly shown in the photography; the female kisses the male's penis and licks his testicles. The female then begins to strike the male subject on the back with a leather strap. The background noises were of moans and groans by the male subject who was being accosted with the strap by the female. Next was depicted "Homosexuality". The scene opened again in full color depicting two male subjects, both nude on a bed. The film clearly shows each of the males massaging the penis of the other male, the facts indicating great pleasure being derived from the activity. The males kiss and caress each other about the lips and the face and the neck. One male is observed kissing the pubic area around the other male subject's penis. The scene next shown an act of fellatio being performed by one of the male subjects upon the other male subject in closeup camera shots. This particular activity hereinabove described lasted for a period of seven minutes. The male subjects facial expression during the entire showing of this segment appeared to be one of great pleasure and satisfaction. The next segment of the film was captioned "Exhibitism". This segment of the film lasted approximately seven minutes. It depicted a nude male and a nude female standing together in front of a mirror. The male subject was standing immediately behind the nude female subject and was depicted as rubbing the penis. He is also depicted manipulating the female clitoris and breasts. They are observing their reflections in the mirror. They were depicted writhing around and obviously enjoying the activity. The next scene depicted masochism. The scene lasted for three minutes. The scene depicts a completely nude male and female in bed together, with the female fondling and manipulating the male penis. The female then straddles the male about the mid-region of the body with the male penis making contact with the female's vagina. The next scene depicts the male on top of the female with the male engaged in clearly visible movement of the torso suggestive of sexual intercourse. The scene ends with the male striking the female on the buttocks area with his hand. Moaning and groaning was present throughout the scene of sexual intercourse and the striking of the female with the hand by the male.

Next was a scene entitled "Transvestite Is.". The scene opens with a nude male standing beside a bed, and on the bed were various articles of female underclothing. The male model began putting on a pair of silk panties. He

proceeded to dress himself in female stockings, a brassiere, and then placed a female wig on his head. This process took approximately nine minutes. The next scene was captioned "Artificial Coition". The scene lasted for a period of seven minutes. The scene depicts a female lying completely nude on a bed, clearly showing the pubic area and the vagina. She is rubbing her body with a long white vibrator shaped like a male penis. She presses the vibrator against the clitoria area of the vagina on several occasions. While lying there, the scene then shows a nude male entering the bedroom and going to the bed and proceeds to mount the female. The male testicles are in clear view and when the male assumes the copulating position, the male testicles are clearly shown to be in contact with the female pubic hair. The male then leaves the scene and the female with vibrator in hand again places it in the clitorial area. The next scene clearly depicts the male's middle finger of the right hand entering the female vagina of one of the females. One of the females then straddles the male, the female licks and kisses the breast of the other female who is having intercourse. As the male and female change positions, the other female is then depicted forming an act of fellatio upon the male. The next depicted is "Lesbianism". This segment depicts a female lying nude on a bed massaging her own breasts. The scene shifts and reveals a nude female sitting in what appears to be a picture frame. The female in the picture frame then becomes alive, steps out of the picture frame and onto the bed with the other nude female. The one female was blonde headed, the other female was a brunette. The brunette female began to manipulate the sex organ of the blonde female. Each of the females took turns licking and kissing the breasts of the other and licking and kissing the pubic area of the other. And one of the female's fingers penetrates the vagina of the other female during this scene.

Next "Troixism" is depicted again. This scene depicts one nude female in bed with two nude males. The scene clearly shows the female sex organs and the male sex organs. One nude male is located on each side of the female with each of the males kissing the breasts of the female and each male alternating fondling the vagina of the female. On occasion, the male finger penetrated the vagina of the female. She is then depicted as having sexual intercourse with each of the males. The next scene depicts the female lying on her side having intercourse with one male while on her other side was the other male who was having anal intercourse at the same time with the same female. One male is depicted from time to time mouthing the pubic area of the female. The next scene depicted "Transvestite Ism", and lasted for a period of three minutes. This segment shows a male, previously described, as dressed in female undergarments. He was in bed with a nude female. The male is shown with his fingers in the vagina of the female. He then removes the female panties from the male and proceeds to masturbate the male. The female then climbs on the male and has intercourse with him. The same female is then observed licking and kissing the penis of the male. She then climbs back into the intercourse position and depicts further copulation with the male. The male then rolls the female off of him and is depicted as manipulating her clitoris with his hands. He is seen kissing her breasts. Both the male and the female alternately perform acts of fellatio and cunnilingus. The next scene is "Voyeurism". The scene opens with a male standing behind what appears to be a screen with his head visible observing a nude male and female on a bed in a room with the male performing an act of cunnilingus on the female. The male and female then engage in acts of mutual masturbation. They then change positions to enable the female to perform an act of fellatio upon the male. The scene fluctuates from mutual masturbation, cunnilingus, and fellatio, and finally ends with

the couple engaging in act of sexual intercourse. The male subject then comes back on the screen, being the same male subject that introduced the film, and advises the audience that the film was produced under the technical stewardship of Richard Stuart, P.H.D. [T]he undersigned affiant observed what will be herein described as Trailer No. 1. The film has no sound or narration, but it is in color and appears to be on 16 millimeter film. The scene depicts a nude female subject lying on a bed massaging her body. She tosses and turns in writhing motions of pleasure and clearly exposes her vagina to the camera. [T]he undersigned observed what will herein be described as Trailer No. 2. Music is heard but no title or introduction is offered to the viewers. There is a scene with a nude female who rubs her body and kisses her own breast. She used both hands to open and close the vagina and therein engages in masturbation. The camera comes in for an open close up of the vagina.

Next is depicted Trailer No. 3. This scene depicts a female stripped but still wearing panties and a male wearing no shirt but wearing trousers. He massages the female's body and then removes the female's panties. He then begins to masturbate the female. The female then assists the male in removing his trousers. He is wearing no underclothing. The penis exposed and the female begins massaging the male penis. Both participants appear to be young. The actor and actress in this scene appear to be teenaged. [T]he undersigned observed what will be described herein as Trailer No. 4. A female is depicted. She undresses, and gets into a bed. There is no sound or title but the film is in color. The female then begins opening and closing the vagina with her fingers. The female is masturbating.

Next will be described as Trailer No. 5. A white male is depicted as walking up the walk toward an apartment. The scene then shifts to a female on the inside of the apartment who has proceeded to partially undress and to then lie in a bed and begin massaging her own body and writhing in pleasure. A male subject has now entered the apartment and moves toward the bed where the female is lying and begins to caress the body of the female. The male then goes on to massage the female vaginal area. The male then completes the job of undressing the female, and the female is depicted as lying in bed completely nude. The male then leans over and begins to perform an act of cunnilingus upon the female. As the trailer proceeds, the male removes his shoes and removes the remainder of the female's clothing. The male removed the shirt with the assistance of the female. The female assists the male in removing his trousers and he is wearing no underclothing so that the male penis and genitals are clearly exposed. The female then fondles the male and begins to perform an act of fellatio upon the male. The male appears to have an erection. The male then proceeds to perform another act of cunnilingus upon the female."

■ At the time of the execution of the foregoing affidavit, Robert L. Rosi, Special Agent of the Federal Bureau of Investigation executed an affidavit before the Judge that he had investigated, among other things, the shipment in and the receipt from interstate commerce of films addressed to the Folly Theatre, 300 West 12th Street, Kansas City, Missouri, and indicating that an express company or other common carrier had been used for such interstate transportation. The affidavit reveals probable cause to believe that the motion pictures heretofore described were shipped in interstate commerce by means of an express company or other common carrier as defined in the statute.

After fully considering the information set forth in the two affidavits we granted the United States Attorney's Petition for Order to Show Cause. This court's Order to Show Cause, issued on October 30, 1970, states:

"[I]t is hereby

Ordered that respondents or the persons in charge of said film appear

forthwith before this Court and then produce said film in its present condition to show cause, if any there be, why a search warrant issued by this Court should not be executed against said films and why they should not be seized thereunder and held for further legal proceedings by the United States against such persons who may have knowingly used any express company or common carrier for their carriage in interstate commerce or may have knowingly taken said films from any such express company or common carrier in violation of 18 U.S.C. § 1462; and it is further

Ordered that this order shall be returnable forthwith, that is, at once or as soon as said films can be transported and exhibited to the court; and it is further

Ordered that a copy of the petition herein be attached to and served with a copy of this order and that such service shall be made by any United States Marshal, Special Agent of the Federal Bureau of Investigation, or any Assistant United States Attorney upon respondents and upon the persons in charge of said film and the establishment described in said search warrant."

On the same day, October 30, 1970, based upon the information theretofore supplied to the judge, a search warrant was issued to search the premises located at 300 West 12th Street. Coincidental with the signing of the search warrant by the Judge, it was delivered by him to the government officers making the affidavits with direction to serve a copy of the said warrant upon the theatre.

Upon the service of the search warrant and the show cause order it was stipulated by and between the United States Attorney and Mr. Charles Hopper, manager of the Follies Theatre, that the films had been produced and were in the office of the United States Attorney, and that a hearing might be postponed to a time and day to be agreed upon by the parties and the court. It was further stipulated that the "films were not produced pursuant to a seizure under the search warrant issued by Judge Duncan * * * but * * * in compliance with the order to show cause." This stipulation would indicate that the search warrant was not and has not been executed as to the films.

After the issuance of the show cause order and the search warrant, the Judge was available in chambers for the purpose of a hearing to determine the issue of obscenity, but an immediate hearing was not requested, after service of the order and warrant.

On November 5, 1970, the films were viewed by the Judge in the theatre at the Richards-Gebaur Air Force Base at Grandview, Missouri, through the courtesy of the Base Commander. Due notice of the showing was given to respondents' counsel. At that time the court viewed the entire film and such "trailers" as followed the showing of the film. The "trailers" were short scenes from films that were to be exhibited in following weeks at the Folly Theatre.

We have carefully studied the affidavit of the Assistant District Attorney who first viewed the picture and are informed that he verbally recorded the scenes by means of a tape recorder as they appeared on the screen in the theatre.

We have reviewed our own notes taken when we viewed the picture, and also have listened to a tape recording of our recollection made by us shortly following the viewing of the picture and the making of the notes. We have compared our recorded data with the affidavit of the Assistant District Attorney and believe that he has correctly described the various scenes as shown in the film, and we accept as our findings his detailed description as set out in his affidavit.

The film "ANOMALIES" was a 35 mm colored sound film. After reviewing the film the court set the hearing for 10:00 o'clock a. m. on November 20, 1970, in Division No. 3 of the United States District Court in Kansas City, and

all the parties were given due and timely notice.

◼ Prior to the date of hearing the District Attorney and the attorneys for the respondents entered into a stipulation waiving their right to present any testimony at such hearing, but reserving any legal rights which might be available to them in any future proceedings to the same extent as if they had appeared and presented such legal and factual questions as may have been available to them at a hearing. The respondents did, within the time allowed by the court, file a brief in which they contend that the film was not obscene as defined by the law. § 1462, Title 18, United States Code provides:

"Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—

(a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or * * *."

The statute does not define the words used therein and the courts have been left to decide what is obscene. Since Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), many courts have discussed the meaning of the word obscene, and whether the material in the case before the court fell within the standard laid down in *Roth*. None of the words in the statute are technical words and all of them have a well defined meaning. The *Roth* case makes it clear that the First Amendment does not protect obscenity.

◼ In viewing the picture we were careful to keep in mind the definition of "obscenity" as set out in *Roth, supra*, A Book v. Attorney General, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) and other cases in which the question of obscenity had been before the courts, i. e., "Whether to the average person applying contemporary community standards the dominant theme of the material taken as a whole appeals to prurient interest in sex."

In *A Book, supra*, the court held that three elements must coalesce to bring the material within the definition. "[I]t must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

Before we can say whether the dominant theme of a picture appeals to prurient interest in sex, we must first determine the meaning of "prurient". Webster's Unabridged Dictionary defines the word as: "Itching, longing, uneasy with desire or longing, having a lascivious desire, curiosity, or propensity; lustful".

Here we are not dealing with written words to determine whether when read they appeal to the prurient interest in sex. We are dealing with pictures— moving pictures—that are almost as graphic as if we were looking at "live" characters acting in front of the camera. Nothing is truer than the old Chinese proverb that "One picture is worth a thousand words".

The impressions made upon the mind do not and cannot produce the same emotional reaction as seeing the act which the words seek to describe. The word-picture of a murder cannot produce the same mental or emotional reaction as to actually see the murder committed or to see a vivid portrayal of the scene upon a motion picture screen. To read a description or hear discussed sexual acts cannot create the impression upon the human mind or appeal to the prurient as would the observance of the acts themselves.

We are not unmindful of the fact that there has been a substantial relaxation of the public morals with respect to the subject of sex. Sex has been brought out into the open for discussion in all

areas of our society, including some of our schools. We find the word "sexy" applied to a multitude of things, not only in referring to men and women, but also to inanimate objects, from tooth paste to automobiles.

We have always had sex with us and always will if the world is to survive, unless some scientific way is found to artificially produce human life. But, from the great "to-do" that the present generation is making about sex, it would seem that they have just discovered it. Notwithstanding such liberalized view, we believe that the "contemporary community standards" have not been relaxed to the extent that the public is willing to have the most confidential relationship between man and woman—the sex act—removed from the privacy of the bedroom to the glaringly lighted studio to be recorded for public exhibition in moving picture theatres, for a price.

We read that the homosexuals are clamoring for public recognition. According to the public press they are moving into a community in a distant state in large numbers hoping that by a majority vote they can take over the city government. But we have not heard that even they are seeking to bring their deviant form of sexual relations out into the open for the public to gaze upon. There may be some who, for money, are willing to participate in the making of motion pictures for public exhibition, but there are surely the rare exception. Just as there are some who are willing to engage in normal sexual relations for public display for money. But they too, are the rare exception.

The pictures we have viewed and described herein reveal almost every form of sexual intercourse both natural and unnatural, in various positions. We do not see how such pictures could be produced except for the sole purpose of appealing to the prurient interest in sex for financial gain. In this connection we quote from a recent newspaper article headed—"Mob Moves in on the Coast". After describing the economic situation in the movie industry, the article states:

"But there are also other troubles in this Paradise. The mob is moving in to take over those joyless dens of nervous gaiety, the topless and bottomless bars. Strong-arm methods, blackmail, and threats of mayhem are being used to take them over, with the kind of thrust which hurts everyone —the small businessmen who own them, the performers, and the customers who pick up the tab. The mob— and there is still some question as to whether it is a local free-lance operation or tied to the big Syndicate— isn't content merely to cut itself in on the profits and ownership of growing wiggle-and-bounce industry. There are bigger stakes."

Are the "bigger stakes" the control of the industry making obscene pictures solely for the purpose of appealing to the prurient interest in sex?

After careful study of the picture and the trailers following it, and considering the decisions construing the statute, it is our conclusion that the motion pictures are obscene, lewd, lascivious, indecent, filthy and vile. In short, they constitute hard-core pornography. There is no plot to the pictures, they simply reveal unrelated acts of sexual relations, both natural and unnatural.

It is our opinion that these motion pictures meet the standards laid down in A Book v. Attorney General, supra, in that "the dominant theme of the material taken as a whole appeals to a prurient interest in sex; the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and the material is utterly without redeeming social value".

In view of the aforesaid Findings of Fact and Conclusions of Law—

It is hereby ordered that the search warrant issued by this court on October 30, 1970, be executed against the motion picture films described therein.