**UNITED STATES of America,
Petitioner,**

v.

**STRAND ART THEATRE CORP. and
Dorothy Ross and Edward Ross,
Respondents.**

No. 18840–D.

United States District Court,
W. D. Missouri, W. D.

Dec. 29, 1970.

Anthony P. Nugent, Asst. Dist. Atty.,
for plaintiff.

Kenneth E. Bigus, of Kansas City,
Mo., for defendant.

## FINDINGS OF FACT, CONCLU-
SIONS OF LAW AND ORDER
OF SEIZURE.

DUNCAN, Senior District Judge.

On October 30, 1970, the United States District Attorney filed a "Petition For Order to Show Cause" why a search warrant should not be executed against certain motion picture films referred to and described in an affidavit of William A. Kitchen, Assistant United States District Attorney.

The petition states that the said films have been found to contain numerous and repeated depictions of nude men and women performing various sexual acts including copulation, fellatio and cunnilingus, both homosexual and heterosexual, that the films have been taken from express companies or common carriers by persons who were believed to have knowledge of their obscene character, and that the films are obscene, lewd, lascivious and filthy within the meaning of Title 18 Section 1462 United States Code.

The affidavit of William A. Kitchen, Assistant United States District Attorney, acknowledged in the presence of the Judge of this court, states that on or about the 27th day of October, 1970, the affiant paid the sum of $3.00 as the price of admission to the Strand Art Theatre, 3542 Troost Avenue, Kansas City, Missouri, and while inside he observed the showing of two full length productions and several shorter film strips known in the motion picture industry as "trailers".

At the time of the execution of the foregoing affidavit, Robert L. Rosi, Special Agent of the Federal Bureau of Investigation executed an affidavit before the Judge that he had investigated, among other things, the shipment in and the receipt from interstate commerce of films addressed to the Strand Art Theatre, 3542 Troost Avenue, Kansas City, Missouri, and indicating that an express company or other common carrier had been used for such interstate transportation. The affidavit reveals probable cause to believe that the motion pictures heretofore described were shipped in interstate commerce by means of an express company or other common carrier as defined in the statute.

After fully considering the information set forth in the two affidavits we granted the United States Attorney's

Petition for Order to Show Cause. This court's Order to Show Cause, issued on October 30, 1970, states:

"[I]t is hereby

Ordered that respondents or the persons in charge of said film appear forthwith before this Court and then produce said film in its present condition to show cause, if any there be, why a search warrant issued by this Court should not be executed against said films and why they should not be seized thereunder and held for further legal proceedings by the United States against such persons who may have knowingly used any express company or common carrier for their carriage in interstate commerce or may have knowingly taken said films from any such express company or common carrier in violation of 18 U.S.C. § 1462; and it is further

Ordered that this order shall be returnable forthwith, that is, at once or as soon as said films can be transported and exhibited to the court; and it is further

Ordered that a copy of the petition herein be attached to and served with a copy of this order and that such service shall be made by any United States Marshal, Special Agent of the Federal Bureau of Investigation, or any Assistant United States Attorney upon respondents and upon the persons in charge of said film and the establishment described in said search warrant."

On the same day, October 30, 1970, based upon the information theretofore supplied to the Judge, a search warrant was issued to search the premises located at 3542 Troost Avenue. Coincidental with the signing of the search warrant by the Judge, it was delivered by him to the government officers making the affidavits with direction to serve a copy of the said warrant upon the theatre.

After the issuance of the show cause order and the search warrant, the Judge was available in chambers for the purpose of a hearing to determine the issue of obscenity, but an immediate hearing was not requested.

On November 6, 1970, the films were viewed by the Judge in the theatre at the Richards-Gebaur Air Force Base at Grandview, Missouri, through the courtesy of the Base Commander. Due notice of the showing was given to respondents' counsel. At that time the court viewed the two films in their entirety and such "trailers" as followed the showing of the films. The "trailers" were short scenes from films that were to be exhibited in following weeks at the Strand Art Theatre.

The first film was a full length 35 mm film entitled:

"PORNOGRAPHY: COPENHAGEN 1970".

By way of introduction, the following language appeared:

"Denmark has legaliged pornography— available to all over 16 years of age. Keep Pornography clean".

The picture begins by showing a news stand, the walls of which are completely covered with pornographic magazines. A young man with a microphone is interviewing an elderly gentleman, the proprietor of the news stand, on the subject of pornographic literature. The pictures portray views and scenes of all forms of sexual acts, both natural and unnatural, heterosexual and homosexual, in such vivid naturalness as to appeal to the prurient. The pictures of sexual acts are not simulated, but portray actual scenes of penetration with the penis, the mouth and the tongue.

A subsequent scene reveals another news stand, the walls of which are also lined with the same kind of obscene magazines, showing all forms of sexual positions. A young woman, nude from the waist up, employed as a clerk in the news stand, is being interviewed, in regard to the attitude of her customers concerning her nudity. She says people like her "topless".

A producer of pornographic pictures announces that 25% of his product is

sold in the United States. He states that such films are made in hotel rooms or in apartments and that he has no studio. The picture reveals numerous sex clubs in Copenhagen. Signs appearing in bold letters on the front of the clubs announce their type of entertainment.

The first scene in the film shows a man and a woman sitting on a couch. The woman is playing with the man's penis, which is erect, and another girl is using an electric vibrator on his penis. One girl engaged in mouthing the penis but does not engage in actual fellatio. Both girls have removed their clothes and continue to fondle and kiss the man's body. The man takes the electric vibrator and apparently intends to insert it into the vagina of one of the girls, but actual penetration is not shown.

Another scene is taken in a sex club where an actual act of intercourse takes place. There are other scenes in the club which are more or less of the strip tease type.

In another scene a man and woman are shown engaging in intercourse. He is sitting in a straight-back chair and she is shown facing him sitting across his lap. It unmistakably reveals the parties in the act of having intercourse. Still another scene reveals a man and a woman lying on their backs with their heads in opposite directions having intercourse. A rather unusual position but unmistakably there is actual penetration visible to the audience.

Another scene vividly depicts a man engaging in cunnilingus with a woman. There were still other scenes of intercourse, one of which showed the woman on top of the man. Then came a "3 decker". A man and a woman having intercourse, she on the bottom, he on top. A third man was engaged in pederasty with the man on top. The parties then rotated and the first man was on the bottom, the woman was on top engaging in intercourse and the second man was engaging the woman in pederasty. Another "Triple decker".

Continuing the orgy, two women engage in violent love-making—kissing and fondling each other's bodies and breasts, all clothing is removed and they engage in rubbing each other's vagina. Finally, one engaged in cunnilingus with the other, while the other is fingering the clitoris of the former. They again engage in kissing and fingering each other's clitoris. They engage in simulating intercourse. Following this futile attempt they again engage in cunnilingus, the one upon whom cunnilingus is being committed, takes hold of the hair of the other to hold her in position. The partners then change positions and the first girl engages in cunnilingus with the second girl. Their acts are perfectly visible in each detail to the audience.

Another scene of intercourse reveals a woman rubbing a man's testicles during intercourse. Here it is announced that the man has very large genitalia and the woman complete lust.

Two men are lying upon a bed next to each other. Two women begin to masturbate the men and it is announced that in the sex clubs sometimes wagers are made as to which man will have an orgasm first.

A final scene, depicts Troixism—two women and a man. The performers engage in various forms of sexual relations, including cunnilingus and fellatio. This is probably the most revolting scene of all.

The finale of the reel shows one of the women who participated in this last orgy, in her home with her husband and two small children. We wonder what the producers meant when they said,—"Keep pornography clean".

Following the main feature—"Pornography: Copenhagen 1970"—several trailers including, "The Trucker's Girl", "Tender is the Flesh", "Penetrator", "Midnight Cowgirl", and a 16 mm feature film entitled "G. W. Feels", were shown.

We viewed them all and have reviewed our tape recording made at the time of

viewing the films. They are similar to all the others and portray many revolting sexual acts, and we see no good purpose to be served in setting out such acts in detail.

On November 13, 1970, at a conference called by the court, counsel for respondents indicated that it was their desire to introduce no evidence in response to the Show Cause Order. Following such announcement respondents were directed to file briefs in support of their legal theories, but no briefs have heretofore been received by the court on behalf of these respondents.

Section 1462 Title 18 United States Code provides:

"Whoever brings into the United States, or any place subject to the jurisdiction thereof, or knowingly uses any express company or other common carrier, for carriage in interstate or foreign commerce—

(a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or * * *."

The statute does not define the words used therein and the courts have been left to decide what is obscene. Since Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), many courts have discussed the meaning of the word obscene, and whether the material in the case before the court fell within the standard laid down in Roth. None of the words in the statute are technical words and all of them have a well defined meaning. The Roth case makes it clear that the First Amendment does not protect obscenity.

In viewing the pictures we were careful to keep in mind the definition of "obscenity" as set out in Roth, supra, A Book v. Attorney General, 383 U.S. 413, 86 S.Ct. 232, 15 L.Ed.2d 154 (1966) and other cases in which the question of obscenity had been before the courts, i. e., "Whether to the average person applying contemporary community standards the dominant theme of the material taken as a whole appears to the prurient interest in sex."

In A Book, supra, the court held that three elements must coalesce to bring the material within the definition. "[I]t must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

Before we can say whether the dominant theme of a picture appeals to prurient interest in sex, we must first determine the meaning of "prurient". Webster's Unabridged Dictionary defines the word as: "Itching, longing, uneasy with desire or longing, having a lascivious desire, curiosity, or propensity; lustful".

Here we are not dealing with written words to determine whether when read they appeal to the prurient interest in sex. We are dealing with pictures—moving pictures—that are almost as graphic as if we were looking at "live" characters acting in front of the camera. Nothing is truer than the old Chinese proverb that "One picture is worth a thousand words".

The impressions made upon the mind do not and cannot produce the same emotional reaction as seeing the act which the words seek to describe. The word-picture of a murder cannot produce the same mental or emotional reaction as to actually see the murder committed or to see a vivid portrayal of the scene upon a motion picture screen. To read a description or hear discussed sexual acts cannot create the impression upon the human mind or appeal to the prurient as would the observance of the acts themselves.

We are not unmindful of the fact that there has been a substantial relaxation of the public morals with respect to the subject of sex. Sex has been brought out into the open for discussion in all

areas of our society, including some of our schools. We find the word "sexy" applied to a multitude of things, not only in referring to men and women, but also to inanimate objects, from tooth paste to automobiles.

We have always had sex with us and always will if the world is to survive, unless some scientific way is found to artificially produce human life. But, from the great "to-do" that the present generation is making about sex, it would seem that they have just discovered it. Notwithstanding such liberalized view, we believe that the "contemporary community standards" have not been relaxed to the extent that the public is willing to have the most confidential relationship between man and woman—the sex act— removed from the privacy of the bedroom to the glaringly lighted studio to be recorded for public exhibition in moving picture theatres, for a price.

We read that the homosexuals are clamoring for public recognition. According to the public press they are moving into a community in a distant state in large numbers hoping that by a majority vote they can take over the city government. But we have not heard that even they are seeking to bring their deviant form of sexual relations out into the open for the public to gaze upon. There may be some who, for money, are willing to participate in the making of motion pictures for public exhibition, but they are surely the rare exception. Just as there are some who are willing to engage in normal sexual relations for public display for money. But they too, are the rare exception.

The pictures we have viewed and described herein reveal almost every form of sexual intercourse both natural and unnatural, in various positions. We do not see how such pictures could be produced except for the sole purpose of appealing to the prurient interest in sex for financial gain. In this connection we quote from a recent newspaper article headed—"Mob Moves in on the Coast". After describing the economic situation in the movie industry, the article states:

"But there are also other troubles in this Paradise. The mob is moving in to take over those joyless dens of nervous gaiety, the topless and bottomless bars. Strong-arm methods, blackmail, and threats of mayhem are being used to take them over, with the kind of thrust which hurts everyone —the small businessmen who own them, the performers, and the customers who pick up the tab. The mob— and there is still some question as to whether it is a local free-lance operation or tied to the big Syndicate— isn't content merely to cut itself in on the profits and ownership of growing wiggle-and-bounce industry. There are bigger stakes."

Are the "bigger stakes" the control of the industry making obscene pictures solely for the purpose of appealing to the prurient interest in sex?

After careful study of the pictures and the trailers following them, and considering the decisions construing the statute, it is our conclusion that the motion pictures are obscene, lewd, lascivious, indecent, filthy and vile. In short, they constitute hard-core pornography. There is no plot to the pictures, they simply reveal unrelated acts of sexual relations, both natural and unnatural.

It is our opinion that these motion pictures meet the standards laid down in A Book v. Attorney General, supra, in that "the dominant theme of the material taken as a whole appeals to a prurient interest in sex; the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and the material is utterly without redeeming social value".

In view of the aforesaid Findings of Fact and Conclusions of Law—

It is hereby ordered that the search warrant issued by this court on October 30, 1970, be executed against the motion picture films described therein.