482 F.2d 515
 PERIAL AMUSEMENT CORP. et al., Plaintiffs-Appellants,
v.
Robert A. MORSE, Individually and in his Capacity as the
United States Attorney for the Eastern District of New York,
and Max Schiffman, Individually and in his Capacity as a
United States Magistrate for the Eastern District of New
York, Defendants-Appellees.
 No. 890, Docket 73-1485.
 United States Court of Appeals,
Second Circuit.
 Argued April 27, 1973.
Decided June 1, 1973.
 
 Ralph J. Schwarz, Jr., New York City (Herbert S. Kassner, Kassner & Detsky, New York City, of counsel), for plaintiffs-appellants.
 Ronald E. DePetris, Asst. U. S. Atty (Robert A. Morse, U. S. Atty., E. D. New York, L. Kevin Sheridan, Asst. U. S. Atty., Brooklyn, N. Y., of counsel), for defendants-appellees.
 Before KAUFMAN, Chief Judge and MANSFIELD and BREITENSTEIN,* Circuit Judges.
 MANSFIELD, Circuit Judge:
 
 
 1
 In an age that has witnessed unprecedented liberality in matters sexual, we are asked on this appeal to determine whether, in proceedings for enforcement of laws against obscenity through seizure of allegedly obscene material, First Amendment rights have been violated. At issue is the appropriateness and constitutionality of proceedings instituted by the government pursuant to Rule 41, F.R.Cr.P., whereby it applied to a federal magistrate for a search and seizure warrant and simultaneously moved by order to show cause and subpoena duces tecum for an adversary hearing at which the obscenity of the material would be preliminarily determined before any seizure.
 
 
 2
 Appellants, who are owners and employees of certain theaters which had exhibited an allegedly obscene film, "The Blue Balloon," sought to invalidate the proceedings before the federal magistrate on the grounds, among others, that he was without power to hold a prior adversary hearing under Rule 41, F.R.Cr. P., and that in any event the proceedings failed to conform to the constitutional requirements of the First Amendment. As we agree with the district court which rejected these assertions, we affirm its order.
 
 
 3
 On February 19, 1973, the United States Attorney for the Eastern District of New York filed with United States Magistrate Max Schiffman applications for the issuance pursuant to Rule 41 of warrants authorizing the search of six movie theaters[1] located in the Eastern District and the seizure of copies of "The Blue Balloon" on the grounds that the film was obscene and had been knowingly shipped in interstate commerce (from New Jersey to New York) by common carrier in violation of 18 U. S.C. Sec. 1462. The supporting affidavits of FBI Agent John Monaghan gave a detailed description of the motion picture as consisting for the most part of a series of scenes vividly depicting discrete and explicit acts of sexual intercourse, homosexuality, sadism, fellatio, and cunnilingus, with close-up "scenes centering on the sexual organs showing penetration and withdrawal with subsequent ejaculation." The affidavits also alleged that "The Blue Balloon" was scheduled to play at these theaters only through Tuesday, February 20, 1973.
 
 
 4
 Concurrently with his request for the search warrants, the United States Attorney applied to the magistrate for orders directed to the owner and/or manager of each theater to show cause why each of the search warrants should not be issued. The reason given by Assistant United States Attorney DePetris in the application for the hearing was his desire to satisfy "the requirement under the First Amendment that an adversary hearing on the issue of obscenity be provided before an allegedly obscene motion picture film can be constitutionally seized." Magistrate Schiffman granted the applications and ordered that the owner of each theater "and all persons having a proprietary interest in, or charge or control of, the motion picture film entitled 'The Blue Balloon' show cause . . ." on February 21, 1973, the day after the film's scheduled closing, why a search warrant authorizing the search should not be issued.[2] On February 19, 1973, 12 subpoenas duces tecum were issued to most of the various individual and corporate owners, managers or assistant managers, directing production of the film.
 
 
 5
 On February 21, 1973, an adversary hearing prior to any search or seizure was held before Magistrate Schiffman. An attorney for the theaters moved for a two-week adjournment, claiming "this film is not being exhibited in these six theaters as of yesterday. No prejudice could be shown to the People or to anybody by granting this adjournment . . ." The magistrate denied this motion and rejected arguments that the proceedings were null and void, noting that an adversary hearing prior to the issuance of the warrant was necessary to conform to the requirements of the First Amendment. After the magistrate ruled that none of the witnesses need testify, and that subpoenas to produce the film did not violate the Fifth Amendment, Harold Forma, the manager of the Pennway Theatre, produced one print of the film, which was introduced into evidence. The magistrate concluded that one copy of the film was sufficient as "the purpose of the issuance of the search warrant [was] not to suppress expression [but] to obtain evidence in connection with a prosecution."
 
 
 6
 The film was shown to the magistrate,[3] who then granted a request by the attorney for the theaters for an adjournment of the hearing in order to make an application to the district court and to obtain expert testimony on the issue of the film's obscenity. The hearing, originally scheduled to reconvene on March 7, was later adjourned pending the district court's disposition of the application. In the interim the film was placed in the custody of Mr. Kassner, counsel for the theaters.
 
 
 7
 The proceeding before us on appeal stems from this attempt by the theaters, appellants herein,[4] to nullify the prior adversary hearing before the magistrate. On March 2, 1973, they filed their complaint seeking an injunction restraining United States Attorney Morse and Magistrate Schiffman from continuing with the proceedings for seizure of the films and awarding damages. Count I alleged violations of plaintiffs' rights under "The First, Fourth and Fifth Amendments to the Constitution," claiming that Rule 41 was unconstitutional as applied and that in any event the magistrate was powerless to act under Rule 41 prior to institution of a criminal proceeding. Plaintiffs further alleged that the instant proceeding created an impermissible prior restraint and "massive seizure," that "probable cause" was a constitutionally infirm standard to determine whether the warrant should issue, that upon a determination that there was probable cause to find the film obscene the United States Attorney would attempt to seize "all copies of the print throughout the country, so as to effect a complete total nationwide suppression of subject film . . .," and that "the subject film will of necessity be held by the government and thousands of adult citizens will be deprived of their right to view subject film." In addition to injunctive relief plaintiffs sought a declaratory judgment declaring the proceedings void, the magistrate without jurisdiction, and Rule 41 to be unconstitutional as applied. Plaintiffs further sought a writ of prohibition and asked "for the convening, if necessary, of a three-judge court under 28 U.S.C. Sec. 2282 to enjoin the enforcement of Rule 41 . . ." Count II sought damages against the United States Attorney.
 
 
 8
 On March 2, 1973, Chief Judge Mishler signed an order requiring the United States Attorney and Magistrate Schiffman to show cause on March 12, 1973, why the proceedings in which the search warrants were sought should not be enjoined. On March 12, 1973, Judge Mishler denied plaintiffs' request for relief and rejected plaintiffs' contentions that the magistrate was without jurisdiction and that the Rule 41 proceeding violated the First Amendment. He noted that should probable cause be shown, a seizure must be made only "temporarily for evidence, giving the party who owned or possessed the film the almost unlimited right, subject only to [the prosecution's use] of it for preparation of trial . . ." Judge Mishler also ruled that requiring individuals to produce the films pursuant to the subpoena duces tecum violated their Fifth Amendment rights and directed that, absent a waiver of Fifth Amendment rights, no warrant be issued by the magistrate on the basis of his viewing of the film.[5]
 
 
 9
 Plaintiffs' request for a stay of the magistrate's proceeding pending the instant appeal was thereafter denied respectively by the district court and by this court, which expedited the appeal. The proceedings before the magistrate were reconvened on March 22, 1973, at which time the government presented the testimony of an FBI agent who had viewed "The Blue Balloon" at a public theater.[6] No testimony was presented on behalf of the theaters. On March 23, 1973, Magistrate Schiffman, on the basis of the papers and the testimony, concluded that there was probable cause to find "The Blue Balloon" obscene under the prevailing three-fold test[7] and ruled that production of the one print in the custody of Mr. Kassner would satisfy the search warrants.
 
 
 10
 Thus appellants seek reversal of Judge Mishler's order not because of the issue of whether or not "The Blue Balloon" is obscene-that question is not before us -but rather on the grounds that the magistrate lacked jurisdiction to hold an adversary hearing under Rule 41 and that, even assuming jurisdiction, the procedure employed did not conform to the mandates of the Constitution.The Law
 
 
 11
 Some years ago we concluded that "[t]here can be no doubt that a motion picture, like a book, is entitled to the protection of the first amendment. Joseph Burstyn Inc. v. Wilson, 343 U.S. 495, 501-503, [72 S.Ct. 777, 96 L.Ed. 1098]. . . . That protection includes the requirement that an adversary hearing be provided before the allegedly obscene works can be seized." Bethview Amusement Corp. v. Cahn, 416 F.2d 410, 411-412 (2d Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 929, 25 L. Ed.2d 101 (1970). See Astro Cinema Corp. Inc. v. Mackell, 422 F.2d 293 (2d Cir. 1970). That principle, which governs us here, has been established by a line of Supreme Court decisions dating back to Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961).
 
 
 12
 While the guarantees of the First Amendment do not extend to obscene matter, Roth v. United States, 354 U.S. 476, 481-485, 77 S.Ct. 1304, 1 L. Ed.2d 1498 (1957), "constitutionally protected expression . . . is often separated from obscenity only by a dim and uncertain line." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963). Because of this difficulty in determining what matter is obscene and because of the importance of preventing the suppression of protected First Amendment expression, there must be a "procedure before seizure designed to focus searchingly on the question of obscenity." Marcus v. Search Warrant, supra, at 732 of 367 U.S., 81 S.Ct. at 1716 (1961). The object of such a hearing is to provide reasonable insurance that non-obscene matter will not be withheld from the public.
 
 
 13
 The necessity for an adversary hearing before any substantial seizure was delineated in A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964), where a plurality of the Supreme Court found unconstitutional a Kansas statute which authorized the ex parte seizure of all copies of allegedly obscene matter prior to a hearing and an adversary determination of obscenity. Justice Brennan concluded "that since the warrant here authorized the sheriff to seize all copies of the specified titles, and since P-K was not afforded a hearing on the question of the obscenity even of the seven novels before the warrant issued, the procedure was . . . constitutionally deficient." 378 U.S. at 210, 84 S.Ct. at 1725. There followed Freedman v. Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), which invalidated, for failure to provide requisite procedural safeguards, Maryland's system of administrative censorship requiring submission prior to public viewing. Finally, in Lee Art Theatre v. Virginia, 392 U.S. 636, 88 S.Ct. 2103, 20 L.Ed.2d 1313 (1968) (per curiam), the Court invalidated the seizure of a film on the basis of the bald conclusions of a police officer's affidavit in an ex parte proceeding, which "stated only the titles of the motion pictures and that the officer had determined . . . that the films were obscene," 392 U.S. at 636, 88 S.Ct. at 2104. The Court found that "[t]he procedure under which the warrant issued solely upon the conclusory assertions of the police officer without any inquiry by the justice of the peace into the factual basis for the officer's conclusion was not a procedure 'designed to focus searchingly on the question of obscenity' [Marcus v. Search Warrant, 367 U.S. 717, 732, 81 S.Ct. 1708, 6 L.Ed.2d 1127], and therefore fell short of constitutional requirements demanding necessary sensitivity to freedom of expression." 392 U.S. at 637, 88 S.Ct. at 2104.
 
 
 14
 In Bethview Amusement Corp. v. Cahn, supra, and Astro Cinema Corp. Inc. v. Mackell, supra, we applied the foregoing teachings to the seizure of films and held that except for extremely limited time periods, and only under the narrowest of circumstances, cf. Times Film Corp. v. City of Chicago, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961), the seizure of a film must be preceded by an adversary hearing which offers certain procedural safeguards.
 
 
 15
 Here the government sought scrupulously to follow the foregoing mandates. Notice of an adversary hearing by means of an order to show cause was given to the appellants before any seizure of the films was attempted. Indeed the government emphasized in its applications to the court that an adversary hearing on the question of obscenity was essential "before an allegedly obscene motion picture film can be constitutionally seized." In contrast to the affidavit in Lee Art Theatre, Inc., supra, the law enforcement officer's affidavit herein contained a detailed account describing the story line and scenes appearing in "The Blue Balloon" so that the magistrate could, before issuance of the warrant, make a preliminary independent determination on the issue of obscenity. The return date on the order to show cause was set for February 21, 1973, the day after the film was scheduled to close at the theaters in question. The attorney for the theaters noted that the film was no longer "being exhibited in those six theatres" and that even under temporary suspension of the proceedings "No prejudice could be shown to the People or to anybody . . ." (emphasis added).
 
 
 16
 To minimize any restraint during the interval in which plaintiffs would apply to Judge Mishler for relief, the single copy of the film was placed in the custody of plaintiffs' counsel. In contrast to the parade of horrors portrayed in plaintiffs' complaint Judge Mishler directed that any seizure be made only "temporarily for evidence, giving the party who owned or possessed the film the almost unlimited right, subject only to [the prosecution's use] of it for preparation of trial."[8] Cf. Tyrone Inc. v. Wilkinson, 410 F.2d 639 (4th Cir.), cert. denied, 396 U.S. 985, 90 S.Ct. 477, 24 L. Ed.2d 449 (1969); Metzger v. Pearcy, 393 F.2d 202 (7th Cir. 1968). Lastly, and perhaps most important for present purposes, no warrant and thus no seizure could be effected until after plaintiffs were given an opportunity to be heard on the question of obscenity. Moreover, the hearing itself commenced the day after the film's closing.
 
 
 17
 The Magistrate's Jurisdiction and Authority
 
 
 18
 Notwithstanding the government's conscientious efforts to comply with constitutional requirements, appellants raise a number of objections to the proceedings. First they contend that "the Magistrate absolutely had no jurisdiction to entertain the proceedings." Title 28 U. S.C. Sec. 636(a) (Supp.1972) provides that "Each United States magistrate . . . shall have . . . (1) all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure for the United States District Courts. . . ." Rule 41, F.R.Cr.P., authorizes magistrates to issue search warrants under certain circumstances and pursuant to certain procedures. Thus, if the instant proceedings fit within the confines of Rule 41, Magistrate Schiffman clearly had jurisdiction.
 
 Rule 41 provides in pertinent part that:
 
 19
 "(a) A search warrant authorized by this rule may be issued by a federal magistrate . . . upon request of a federal law enforcement officer or an attorney for the government.******
 
 
 20
 * * *
 
 
 21
 "(c) A warrant shall issue only on an affidavit or affidavits sworn to before the federal magistrate or state judge and establishing the grounds for issuing the warrant. If the federal magistrate or state judge is satisfied that grounds for the application exist or that there is probable cause to believe that they exist, he shall issue a warrant. . . . The finding of probable cause may be based upon hearsay evidence in whole or in part. Before ruling on a request for a warrant the federal magistrate or state judge may require the affiant to appear personally and may examine under oath the affiant and any witnesses he may produce. . . ."
 
 
 22
 It is settled that the procedures prescribed by Rule 41 may be invoked prior to the filing of an indictment. See The Fifth Avenue Peace Parade Committee v. Hoover, 327 F.Supp. 238, 242 (S.D.N.Y.1971); Donlon v. United States, 331 F.Supp. 979 (D.Del. 1971). Cf. DiBella v. United States, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962). Indeed more often than not the warrant is used to obtain the evidence required to institute criminal proceedings. The government argues that where, as here, the First Amendment requires, for the protection of those whose property is the subject of a proposed seizure, the prior holding of an adversary hearing, Rule 41 may be read as authorizing such a hearing. We agree. Although a search and seizure warrant normally issues upon an ex parte showing of probable cause, see, e. g., Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), Rule 41(c) was amended in 1972 to provide that "the federal magistrate . . . may require the affiant to appear personally and may examine under oath the affiant and any witnesses he may produce." Rule 41(e), furthermore, provides that a person aggrieved by an allegedly unlawful search and seizure may move for the return of the seized property and obtain an adversary hearing for the purpose of determining the legality of the seizure. Although the amendment of Rule 41(c) refers only to witnesses produced by the affiant, it is clear from the Advisory Committee Note accompanying the proposed change that the purpose was to give the magistrate "an opportunity to make a careful decision as to whether there is probable cause" based upon legally obtained evidence rather than have "the issue raised only later on a motion to suppress the evidence." Thus, while the drafters may not have specifically contemplated the present situation, we believe that their intent can best be effectuated, without doing violence to the language of the rule, by construing it to authorize an adversary hearing of the type conducted by Magistrate Schiffman. Furthermore, it is not unusual for courts to fashion a hearing procedure based on case law, see, e. g., United States v. Alberti, 470 F.2d 878, 881-882 (2d Cir. 1972). Indeed such a course may be mandated where constitutional considerations are at stake.
 
 
 23
 Our conclusion as to the magistrate's jurisdiction to conduct an adversary hearing finds support in decisions of other courts upholding substantially the same procedure as that followed in the present case. See United States v. Strand Art Theatre Corp., 325 F.Supp. 256 (W.D.Mo.1970); United States v. Berger, 325 F.Supp. 249 (W.D.Mo. 1970); United States v. 50 Magazines, 323 F.Supp. 395, 407 (D.R.I.1971); United States v. One Carton Containing Quantity of Paperback Books, 324 F. Supp. 957 (N.D.Ga.1971). Furthermore, this court, in construing New York Criminal Procedure Law Secs. 690.05(1), 690.40(1) (McKinney's Consol.Laws c. 11-A), has recently upheld the jurisdiction of New York's Criminal Court to hold an adversary hearing under the state's search warrant procedures despite the existence of a conflict in the New York Supreme Court decisions on the subject. G. I. Distributors, Inc. v. Murphy, 469 F.2d 752, 754 n. 4 (2d Cir. 1972). See also Maizels v. Van Hoomissen, 429 F.2d 982 (9th Cir. 1970) (per curiam) (Chambers, J., concurring) ("But it would seem that a magistrate could invent a hearing to show cause why a search warrant should not issue.").
 
 
 24
 Thus, we conclude that the magistrate did not act outside his authority when, acting pursuant to authority granted by Rule 41, he held an adversary hearing prior to the issuance of the search warrant.
 
 First Amendment Objections
 
 25
 Appellants next argue (1) that probable cause is an insufficient standard upon which to base the seizure, even after a prior adversary hearing has been held, and (2) that the Rule 41 procedures herein applied do not possess the built-in safeguards needed to insure adequate protection of First Amendment rights.
 
 
 26
 The appropriateness of probable cause as a standard must be judged in the light of the limited purpose, nature and consequences of the adversary hearing. The purpose of that hearing is to provide "a reasonable likelihood that nonobscene publications, entitled to constitutional protection, will reach the public," Marcus v. Search Warrant, supra, 367 U.S. 736, 81 S.Ct. 1718 (emphasis added). The magistrate is required "to focus searchingly on the question of obscenity," id. at 732, 81 S.Ct. at 1716, with the burden of proof being upon the government. Those contesting the proposed seizure must be afforded an opportunity to offer rebuttal evidence before any seizure is permitted. The record in the present case reveals that the magistrate conscientiously followed these principles, carefully applying the three-fold test to the uncontested evidence and affording appellants the opportunity to rebut it, before finding probable cause to believe that "The Blue Balloon" was obscene. Lastly, the consequences of the magistrate's action were quite limited and the restraint was narrowly restricted. One copy of the film was held for the limited purpose of enabling the government to prepare for and to offer it in evidence at trial. The district court, in the exercise of its sound discretion, is not precluded from directing the return of the film to the owner on conditions that will insure its availability for trial.[9] Under these circumstances "a probable cause" standard strikes us as the appropriate balance between the First Amendment's all-important protection of the free exercise of ideas and the public's interest in enforcement of the obscenity laws. Our views in this regard are, furthermore, supported by our recent decision in G. I. Distributors, Inc. v. Murphy, 469 F.2d 752 (2d Cir. 1972), and by decisions of other courts confronted with the issue. See, e. g., United States v. One Carton Containing Quantity of Paperback Books, 324 F.Supp. 957 (N.D.Ga.1971); United States v. Little Beaver Theatre Inc., 324 F.Supp. 120 (S.D.Fla.1971).
 
 
 27
 The Supreme Court's decision in Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971), relied upon by appellants for the proposition that probable cause is an impermissible standard, is clearly distinguishable. There the Court struck down, as violative of the First Amendment, two statutes, 39 U.S.C. Secs. 4006 and 4007, which provided for sweeping administrative censorship of mail alleged to be obscene. Section 4006 authorized the Postmaster General, after determining at an administrative hearing that mailed matter was obscene, to block all mail addressed to the sender of such matter. Pending such determination, Sec. 4007 authorized the Postmaster General in his discretion, upon a showing of probable cause that Sec. 4006 was being violated, to obtain from the court a temporary restraining order detaining the defendant's incoming mail. However, he was not required to seek judicial review. Understandably Sec. 4006 was invalidated because it failed to place the burden on the censor of initiating judicial review of his censorship and failed to provide for a prompt judicial determination of the issue of obscenity before detention of the mail. Since Sec. 4007 suffered from the same fatal deficiencies as Sec. 4006 it was also invalidated. However, in the present case, unlike proceedings under Sec. 4007 which may be instituted in the discretion of the Postmaster General, invocation by the government of judicial action prior to seizure is mandatory, so that both the initial and final determination as to obscenity must be made by court officers rather than by an administrative official. Finally, unlike Blount, which authorized the wholesale detention of all incoming mail, the restraint here is substantially less as to the quantity of matter seized, the scope of the seizure (which is limited to one copy of the film) and its duration, i. e., until trial. We find that these significant distinctions do not render our decision inconsistent with Blount.
 
 
 28
 Appellants also contend that the procedures herein employed lacked a number of "built-in safeguards" needed to insure the preservation of First Amendment values. However, we find no such constitutional infirmity. Appellants' argument that the burden of proof was somehow or other placed on their shoulders at the adversary hearing is fully met by the government's concession that under Rule 41(c) it has the burden of persuading the magistrate that "grounds for the application exist or that there is probable cause to believe that they exist." Here the government fulfilled that burden by presenting the detailed unrefuted affidavits and testimony of the FBI agents. Decisions cited by appellants for the proposition that one seeking to suppress evidence under Rule 41(e) must bear the burden, see Chin Kay v. United States, 311 F.2d 317 (9th Cir. 1963); Batten v. United States, 188 F.2d 75 (5th Cir. 1951); United States v. Masterson, 383 F.2d 610 (2d Cir. 1967), cert. denied, 390 U. S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968), do not govern a proceeding initiated by the government under Rule 41(c).
 
 
 29
 Appellants further argue that it was error for the magistrate to find probable cause without taking into account a personal viewing of the film, even though they precluded him from doing so by successfully invoking the Fifth Amendment after the film was subpoenaed.[10] A finding based upon a viewing of the film would be preferable. However, in view of the detailed nature of the undisputed affidavits and testimony in support of the application for the warrant, we find that the magistrate had ample factual support for his conclusion that probable cause existed. Cf. Lee Art Theatre, Inc., supra, 392 U.S. at 637, 88 S.Ct. 2103.[11]
 
 
 30
 Nor was the government obligated to present expert testimony on the subject. Even in the trial of a criminal case, where charges must be established beyond a reasonable doubt, we have rejected the view "as appellants in effect urge, that the Constitution requires the Government to produce expert testimony about appeal to prurient interest and contemporary community standards in every case." United States v. Wild, 422 F.2d 34, 35 (2d Cir. 1969), cert. denied, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971). Magistrate Schiffman's description of "The Blue Balloon" as "hard, hard core pornography" appears to be amply supported by the detailed description of its scenes in the affidavit properly before him and in the later testimony of Special Agent Ancin.
 
 
 31
 Appellants claim potentially wide-scale suppression of the film upon the magistrate's finding of probable cause. We have recognized that the application of the obscenity laws to films presents some unusual problems. A seizure of a single copy of a film might, under some circumstances, be "massive" in a constitutional sense. Astro Cinema Corp. v. Mackell, supra, 422 F.2d at 295. Yet one print is the minimum unit required for trial preparation. Faced with this problem Judge Mishler sensibly limited the seizure to one print of the film and then only for the purpose of assisting the government in its preparation for trial. In Bethview Amusement Corp., supra, 416 F.2d at 412, we emphasized that there were several unobtrusive ways for courts to make a copy of the film reasonably available for trial. See also Astro Cinema Corp. Inc. v. Mackell, supra, 422 F.2d at 296-297. Pending trial, which should be expedited by the district court, we emphasize that the court should scrupulously seek to limit the restraint on the film to the extent that it can do so consistently with preservation of the print for evidentiary purposes. For instance, the print may be released for the making of copies if requested by the party from whom it was seized, subject to appropriate safeguards.
 
 The Three-Judge Court Issue
 
 32
 Finally appellants raise, but do not seriously press, the question of whether a three-judge court should have been convened under 28 U.S.C. Sec. 2282,[12] since their complaint seeks an injunction restraining the United States Attorney and the magistrate from "proceeding with or carrying out the proceedings. . . ." and challenges the constitutionality of Rule 41 as applied.
 
 
 33
 While there is doubt as to whether a rule of criminal procedure is an "Act of Congress" for the purposes of convening a three-judge court, cf. Sardino v. Federal Reserve Bank of New York, 361 F. 2d 106, 113-115 (2d Cir. 1966), cert. denied, 385 U.S. 898, 87 S.Ct. 203, 17 L. Ed.2d 130 (1966) (which found an agency regulation not to be an Act of Congress), we need not rely on that premise. We do not interpret 28 U.S.C. Sec. 2282 as requiring the convening of a three-judge court under the circumstances presented here. In explaining the background and purpose of that statute the Supreme Court has stated:
 
 
 34
 "Repeatedly emphasized during the congressional debates on Sec. 2282 were the heavy pecuniary costs of the unforeseen and debilitating interruptions in the administration of federal law which could be wrought by a single judge's order, and the great burdens entailed in coping with harassing actions brought one after another to challenge the operation of an entire statutory scheme, wherever jurisdiction over government officials could be acquired, until a judge was ultimately found who would grant the desired injunction. 81 Cong.Rec. 479-481, 2142-2143 (1937)." Kennedy v. Mendoza-Martinez, 372 U.S. 144, 155, 83 S.Ct. 554, 560, 9 L.Ed.2d 644 (1963).
 
 
 35
 The proceeding instituted by the plaintiffs in the present case does not threaten to disrupt the operation of a statutory scheme. Moreover, as Chief Judge Kaufman aptly stated in Astro Cinema Corp. v. Mackell, supra, 422 F.2d at 298, "[w]hile the application did raise constitutional objections that could not be described as clearly insubstantial . . . we see little point in reversing denial of the three-judge court application when to do so could lead only to dismissal by two district judges and one appellate judge instead of three appellate judges." Because the policy concerns underlying Sec. 2282 are not present, we find the foregoing language to be particularly appropriate in the present case, which does not warrant invocation of "the special and extraordinary procedure of a three-judge court." Kennedy v. Mendoza-Martinez, supra, 372 U.S. at 155, 83 S.Ct. at 561.
 
 
 36
 The order of the district court is affirmed.
 
 
 
 *
 Of the United States Court of Appeals for the Tenth Circuit, sitting by designation
 
 
 [1]
 The six theaters to which the applications for the search warrants were directed are: Empire Theatre, Staten Island, New York; Cinema Theatre, Brooklyn, New York; Pennway Theatre, Brooklyn, New York; Astor Theatre, Brooklyn; Avon Theatre, Brooklyn; and the Earle Theatre, Queens, New York. The accompanying papers were virtually identical, differing only as to the name and address of the theater
 
 
 [2]
 Notice of the hearing was served on the manager (or the person in charge) of each of the six theaters; the Vice President of 2094 Corporation, 15 West 55th Street which owns the Empire Theatre, the Vice President of the Brandt Theatres Corporation as owners of the Astor Theatre; and on Penn Theatres Corp., the owner of the Pennway Theatre. William Namenson, the owner of the Avon Theatre, received notice by telephone. Attempts to serve Ray Rhone, the owner of the Earle Theatre, were unsuccessful. Aquarius Releasing Incorporated, the film's distributor, has been served, but attempts to serve the film's producer MPD Film Programs, Inc. were unsuccessful
 
 
 [3]
 It appears that the print which was actually viewed was one produced by the film's distributor
 
 
 [4]
 The corporate plaintiffs are the lessees or operators of the Avon, Pennway, Astor, Earle and Empire Theatres. The individual plaintiffs Harold Forma, Grace Queney, and Edward Montapert are employees of the corporate plaintiffs upon whom either an order to show cause or the subpoena duces tecum was served
 
 
 [5]
 Judge Mishler was of the view that a corporate employee could invoke the Fifth Amendment here because unlike the accountant in Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), possession of the film itself could constitute a crime. The United States Attorney argued that the Fifth Amendment privilege extended only to private papers
 Our decision should not be interpreted as affirming or approving the district court's decision upholding appellants' Fifth Amendment claim. Since the privilege is personal, it cannot be invoked on behalf of the corporate appellants, United States v. Kordel, 397 U.S. 1, 7 n. 9, 90 S.Ct. 763, 25 L.Ed.2d 1, and if the seized film was corporate-owned, it is doubtful that the corporate employee could refuse to turn them over because they might tend to incriminate him personally. See United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944); cf. Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957). However, since there was adequate independent evidence to support the magistrate's findings and since the magistrate based his finding on this independent evidence, we find it unnecessary to decide the issue.
 
 
 [6]
 Though the proceedings of March 22, 1973, were not originally before this court, copies of Magistrate Schiffman's opinion were submitted without objection. The magistrate summarized the testimony of FBI Agent Edward M. Ancin, stating that:
 "[I]t was more explicit detailing in fact all of the acts described in the affidavit, with a running account of homosexual acts committed by a female 'Pauline' after drugging the victim, 'Cindy' a recent bride whose husband had just left for the army. These homosexual acts occurred while Cindy was bound and tied to a bed. Cindy is then made the object of sexual attacks and rape under the eye of Pauline. Two men who paid Pauline, perform acts of intercourse, sadism, fellatio, cunnilingus and bondage upon Cindy who is forced to smoke what appears to be a 'joint' of marijuana or hashish and under the influence of same, offers no resistance. There are additional acts of prostitution and explicit sex and deviate behavior."
 
 
 [7]
 "(a) the dominant theme of the material taken as a whole appeals to prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." Memoirs v. Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966)
 
 
 [8]
 As Judge Mishler has invalidated the subpoenas duces tecum on Fifth Amendment grounds, we treat the proceeding for the purposes of review as one in which the court first gained custody of but one copy of the film pursuant to a search warrant which was not issued and executed until after the adversary hearing and preliminary determination of obscenity. Under this view there was arguably no restraint prior to the hearing. But even if the subpoena duces tecum had not been struck down, the restraint here would be less than that in G. I. Distributors, Inc. v. Murphy, 469 F.2d 752 (2d Cir. 1972), where the majority of the panel found permissible the seizure and overnight retention of certain allegedly obscene material prior to the hearing
 
 
 [9]
 For instance, with modern equipment it is possible at a relatively modest expense to make a copy of the seized film that would be suitable for trial purposes, thus permitting both the government and the appellant from whom it has been withheld each to have copies pending trial
 
 
 [10]
 See notes 5 and 8 supra
 
 
 [11]
 The Court in Lee Art Theatre did not decide "whether the justice of the peace should have viewed the motion picture before issuing the warrant." 392 U.S. at 637, 88 S.Ct. at 2104. See Tyrone v. Wilkinson, 410 F.2d 639, 642-643 (4th Cir. 1969). All we decide is that under the circumstances of this case Magistrate Schiffman was well supported in his finding of probable cause
 
 
 [12]
 28 U.S.C. Sec. 2282 provides:
 "An interlocutory or permanent injunction restraining the enforcement, operation or execution of any Act of Congress for repugnance to the Constitution of the United States shall not be granted by any district court or judge thereof unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."